UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

AIXIANG KONG,

              Plaintiff,

v.

WING YIN LAU, CHEONG WAH SO, DAJIN REALTY, INC., and STEVEN THOMAS GEE,

              Defendants.

**MEMORANDUM & ORDER**
24-CV-3041 (NRM) (CLP)

NINA R. MORRISON, United States District Judge:

This case arises from a nonpayment and eviction dispute between Plaintiff Aixiang Kong ("Kong") and Defendants Wing Yin Lau ("Lau"), Cheong Wah So ("So"), Dajin Realty, Inc. ("Dajin"), and Steven Thomas Gee ("Gee"). Plaintiff, proceeding *pro se*, brings this action against Defendants alleging abuse of process, intentional infliction of emotional distress, false imprisonment, and civil conspiracy. Defendants move to dismiss for failure to state a claim. For the reasons that follow, the Court grants Defendants' motion, and dismisses the Second Amended Complaint with prejudice.

## BACKGROUND

### I. Factual Background

The following facts largely come from the allegations in Plaintiff's second amended complaint ("SAC"), which the Court accepts as true for purposes of the instant motion. Second Amended Compl. ("SAC"), ECF No. 28 (Feb. 28, 2025); *see Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164

1

(1993) (stating that in ruling on a motion to dismiss, the court "must accept as true all the factual allegations in the complaint").

Aixiang Kong is a 71-year-old woman with documented physical disabilities requiring the use of a wheelchair. SAC ¶ 10. Her permanent place of residence is in Wilmington, Delaware. *Id.* Dajin Realty, Inc. is a real estate company located in Queens County, New York. *Id.* ¶ 11. Wing Yin Lau is the owner and principal of Dajin and resides in New York. *Id.* ¶ 12. Cheong Wah So is Lau's husband and a property manager for Dajin, and also resides in New York. *Id.* ¶ 13. Steven Gee is legal counsel for Dajin and resides in New York. *Id.* ¶ 14.

As Kong herself largely concedes, much of the factual background provided in the SAC regarding these parties does not bear on Kong's instant claims, because an earlier lawsuit she filed based on those events was already dismissed in 2024. *See Kong v. Dajin Reality* [sic]*, Inc.*, No. 23-CV-1536 (FB) (CLP), 2024 WL 168325 (E.D.N.Y. Jan. 16, 2024). The Court nevertheless provides an overview of the full timeline as alleged by Kong in order to provide context for the more recent events that are the subject of the instant suit.

In January 2013, Kong entered into a one-year renewable lease agreement with Dajin Realty for a second-floor unit in an apartment in Flushing, New York. SAC ¶¶ 18–19. Kong resided in the apartment with her then-husband, Changhe Cheng ("Cheng"), until the two divorced in 2015. *Id.* ¶¶ 19–20. Following the divorce, Kong relocated to Wilmington, Delaware, while Cheng remained at the Flushing apartment. *Id.* ¶ 20. Though Kong notified the landlord at Dajin that she was no

2

longer residing at the apartment, Dajin continued to include Kong's name on subsequent lease renewals. *Id.* ¶¶ 21–22. In 2016, Cheng entered into a separate lease for a third-floor unit at the same property, and Dajin again included Kong's name on the agreement. *Id.* ¶ 23. On February 28, 2019, Kong's son, Lingxi Kong ("Lingxi"), signed new lease agreements with Dajin and assumed responsibility for both units (collectively, the "Flushing units"). *Id.* ¶ 24.

Though the details are not apparent from the face of the SAC, a dispute arose during this time between Defendants and Kong, Cheng, and Lingxi (collectively, the "tenants") regarding the validity of the lease and nonpayment of rent. On April 19, 2019, Gee called Lingxi and threatened that if the tenants did not vacate the Flushing units, Kong "w[ould] be sued as the primary defendant, she'll be put on the eviction list[,] [h]er credit will be ruined and she will never be able to rent an apartment in the future." *Id.* ¶ 28. On May 1, 2019, Dajin filed suit in Queens Housing Court against Kong and Cheng, seeking an eviction warrant based on the expiration of their leases. *Id.* ¶ 29. The court dismissed the suit without prejudice, finding that Lingxi's 2019 leases were valid. *Id.* ¶¶ 30, 32. However, Dajin subsequently filed a second lawsuit on September 23, 2019, and in May 2020, the Queens Housing Court entered judgment granting Dajin's request for eviction and ordering Cheng to pay $68,963 in unpaid rent. *Id.* ¶¶ 33, 37.

In March 2022, during the COVID-19 pandemic, Lingxi paid approximately $80,000 in Emergency Rental Assistance Program ("ERAP") funds to Dajin to cover rental arrears. *Id.* ¶ 38. The SAC alleges that these funds should have been

3

applied to the outstanding arrears, thereby satisfying the Queens Housing Court's May 2020 judgment. *Id.* ¶¶ 39–40. Also during this time, Kong traveled from Delaware to Queens Housing Court for a hearing on the ongoing eviction proceedings. *Id.* ¶ 42. At this hearing, Gee threatened Kong that if she did not agree to evict Cheng from the Flushing units, "the landlord would continue to pursue her as a defendant in the eviction action." *Id.* ¶ 43.

In April 2022, Dajin and Gee successfully transferred the tenants' eviction case from the Queens Housing Court to the Bronx Housing Court. *Id.* ¶ 45. That court issued three orders authorizing execution of eviction between April 2022 and July 2023. *Id.* ¶ 46. However, after persistent challenges from Lingxi, the case was transferred back to Queens in late 2023. *Id.* ¶ 48. Based on Defendants' attached exhibits, it appears that the Queens Housing Court also entered judgments in May and November of 2023 authorizing the eviction of Kong, Lingxi, Cheng, and two other anonymous tenants. *See* Def Mot. to Dismiss (Mot.), Ex. B at 2–3, ECF No. 33-5 (Mar. 31, 2025).[1]

In January 2024, Kong returned to reside in the Flushing units temporarily to receive medical treatment. SAC ¶ 50. Dajin then scheduled an eviction of all tenants in the Flushing units for March 6, 2024. *Id.* at ¶ 52. In response, on March 5, the tenants reached out to Defendants, offering to deliver a cashier's check for $68,963, the amount reflected in the housing court's May 2020 judgment. *Id.* ¶ 51. Defendants

---

[1] Unless otherwise noted, all page references use the pagination provided by the Electronic Case Filing system.

4

refused, and Gee threatened Lingxi that "if they did not vacate immediately, the payment required would increase from approximately $68,963 to approximately $250,000." *Id.*

The following day, Lau and a City Marshal arrived to execute the eviction. *Id.* ¶ 52. In the presence of the marshal, Cheng attempted to present the check for $68,963 to Lau, but Lau refused acceptance. *Id.* The marshal then "delivered the eviction papers, instructed Lingxi [] that 'you have until 5pm to vacate,' and departed without executing the eviction." SAC ¶ 52. Afterwards, Dajin installed a new lock on the second-floor unit. *Id.* ¶ 53. Cheng attempted to enter, and "injured his hand while forcing entry past the new lock." *Id.* The tenants thus left the premises and mailed the $68,693 check to Dajin, which Dajin accepted. *Id.* ¶¶ 53–54.

On March 11, 2024, believing that the acceptance of the check had resolved the matter, Kong and her co-tenants returned to the Flushing apartment but were again unable to enter the units. *Id.* ¶ 54. Following instructions from Gee, So then called the New York Police Department ("NYPD"), reporting that the tenants were criminal trespassers. *Id.* Officers arrived at the apartment, then placed Kong, Cheng, and Lingxi in handcuffs. SAC ¶ 55. "Two officers approached [Kong], grabbed her arms, and twisted them with significant force, attempting to pull her from the wheelchair and inflicting severe injuries." *Id.* This encounter exacerbated Kong's "pre-existing conditions in her shoulders and spine," caused "new injuries to her right knee and arm," and "reopen[ed] [] fractures from a prior accident." *Id.* ¶ 57. The officers ultimately released Kong, but arrested Lingxi and Cheng, whose

5

charges were dropped after arraignment. *Id.* ¶ 56.

On March 18, 2024, Kong returned to Queens Housing Court seeking to invalidate the eviction and reinstate possession of the apartment. *Id.* ¶ 58. The court issued an order conditionally vacating the warrant of eviction and gave the tenants an opportunity to be restored to possession by payment of all outstanding fees. *Id.* According to orders issued by the Queens Housing Court, which were attached to the Defendants' motion, this sum of unpaid rent totaled approximately $200,000 for the two units. Mot., Ex. F, ECF No. 33-9 (Mar. 31, 2025). On April 8, 2024, having not received such payment, Defendants discarded tenants' personal property in the units. SAC ¶ 60.

## II. Procedural History

In March 2023, Kong filed a complaint in this Court against the current named Defendants based on their efforts to evict Kong, Lingxi, and Cheng from the Flushing units. *Kong v. Dajin Reality* [sic]*, Inc.*, Case No. 23-CV-1536, ECF No. 1. This earlier suit ("*Kong I*") alleged claims based on the events from 2013 to early 2023. *Id.* ECF No. 1 ¶¶ 4–23. On January 16, 2024, Judge Frederic Block dismissed the *Kong I* complaint in its entirety, finding that Kong's claims were predicated on her disagreements with the rulings of the Queens Housing Court, which the Court lacked subject-matter jurisdiction to review. *See Kong*, 2024 WL 168325, at *2 ("To the extent that Kong seeks federal judicial review of the New York state housing courts' decisions, the Court lacks subject-matter jurisdiction to do so under the *Rooker-Feldman* doctrine."); *see generally Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280

6

(2005) (explaining the development and current meaning of the *Rooker-Feldman* doctrine).

Three months later, on April 23, 2024, Kong then filed the instant action. ECF No. 1. An amended complaint was filed on June 11, 2024, ECF No. 12, and Defendants moved to dismiss for failure to state a claim on August 13, 2024, ECF No. 21. After the motion was fully briefed, Kong moved to stay the action pending her appeal in state housing court and also moved for further leave to amend. ECF No. 25 (Jan. 16, 2025). This Court denied the motion to stay but granted leave to amend. Order dated Jan. 24, 2025.

On February 28, 2025, Kong filed the SAC, recounting the facts discussed above, but alleging that "[t]he current action arises from events occurring after the dismissal of the prior case, including a March 2024 false police report and subsequent police incident." SAC ¶ 17. In the SAC, Kong alleges four causes of action against all Defendants: (1) abuse of process; (2) intentional infliction of emotional distress; (3) false imprisonment; and (4) civil conspiracy. SAC ¶¶ 62–92. Defendants moved to dismiss on March 31, 2025. ECF No. 33. That motion is now before the Court.

## **DISCUSSION**

This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are diverse in citizenship and the alleged amount in controversy is over $75,000.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

7

544, 570 (2007)). Because Plaintiff is *pro se*, the Court construes her pleadings liberally and holds them "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *see Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Nonetheless, a *pro se* complaint must state a plausible claim for relief." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013). Though a court must accept a plaintiff's well-pleaded factual allegations as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not sufficient to state a claim. *Iqbal*, 556 U.S. at 678.

The Court begins with two preliminary issues. First, to the extent that the claims in the SAC attempt to re-litigate the incidents addressed in Judge Block's dismissal of the *Kong I* complaint, the Court is precluded from considering those arguments. *Res judicata* "prevents a plaintiff from litigating claims that were or could have been raised in a prior action against the same defendant[s]." *Cieszkowska v. Gray Line New York*, 295 F.3d 204, 205 (2d Cir. 2002) (per curiam). This remains true even if the claims are "based upon different legal theories[,] . . . provided they arise from the same transaction or occurrence." *L-Tec Elecs. Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85, 88 (2d Cir. 1999) (per curiam). As Kong herself concedes, the events from 2013 to 2023 as described in the SAC are the same events on which Kong's 2023 lawsuit was based. *See* SAC ¶ 17; *compare* SAC ¶¶ 18–48, *with Kong*, Case No. 23-CV-1536, ECF No. 1 ¶¶ 4–23. As such, any claims based on those events are precluded from consideration.

Second, the Court observes that much of Kong's instant suit relies on the

assumption that Defendants had no lawful basis for seeking payment from and evicting her and her co-tenants. Though the Court construes Kong's *pro se* complaint liberally, it is not "bound to accept as true [] legal conclusion[s] couched as [] factual allegation[s]." *Iqbal*, 556 U.S. at 678. That is especially so here, where Defendants present as attachments to their motion various dispositions of the Queens Housing Court indicating that there existed valid judgments of nonpayment and warrants of eviction against Kong, Cheng, and Lingxi. Mot. Ex. A, ECF No. 33-4 (Mar. 31, 2025) (January 2023 order referencing the May 2020 judgment); Mot. Ex. B, ECF No. 33-5 (Mar. 31, 2025) (warrants of eviction); Mot. Ex. F, ECF No. 33-9 (Mar. 31, 2025) (March 2024 judgment). While these documents were not included in the SAC, a court may consider "documents incorporated by reference in the complaint," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010), and "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).

Here, the SAC variously refers to all three documents throughout. *See, e.g.*, SAC ¶¶ 40, 46, 52, 58. "When documents attached to the complaint as exhibits or incorporated by reference in the complaint contain statements that contradict the allegations in the complaint, the documents control and the Court need not accept the allegations as true." *Endemann v. Liberty Ins. Corp.*, 390 F. Supp. 3d 362, 370

9

(N.D.N.Y. 2019). Though Kong raises concerns over the validity of the judgments in those documents, it is well established that "[a] federal court is not permitted to judge the merits of the state court's decision." *Grace v. Artuz*, 258 F. Supp. 2d 162, 170 (E.D.N.Y. 2003) (citing *Capellan v. Riley*, 975 F.2d 67, 71 (2d Cir. 1992)). As Judge Block observed in his *Kong I* ruling, "federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005); *see Kong*, 2024 WL 168325, at *2.

The Court thus concludes that Defendants acted upon valid judgments of non-payment and warrants of eviction against Kong, Cheng, and Lingxi. For this and the following additional reasons, the Court grants Defendants' motion to dismiss.

A. Abuse of Process

Plaintiff raises a claim for abuse of process, alleging that Defendants engaged in a "coordinated misuse of judicial and legal processes" by pursuing eviction proceedings against her in 2019 despite her residence in Delaware, transferring the case to Bronx Housing Court in 2022, continuing to pursue eviction after the payment of ERAP funds, refusing to accept the cashier's check in March 2024, and for filing an allegedly false report for criminal trespass. SAC ¶ 64. For an abuse-of-process claim, a plaintiff must show that the defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse o[r] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of New York*, 331 F.3d 63, 70 (2d Cir. 2003) (quoting *Savino v. City of New York*, 168 F. Supp. 2d 172, 179

10

(S.D.N.Y. 2001)).

As discussed, the Court here does not consider Defendants' actions with respect to the 2019 eviction proceedings, the 2022 venue change, or the ERAP funds, as those were the subject of Plaintiff's prior action before this Court. *Kong*, Case No. 23-CV-1536, ECF No. 1 ¶¶ 4–23. Indeed, in his earlier dismissal, Judge Block construed the complaint as raising an abuse-of-process claim, which he dismissed on its merits. *See Kong*, 2024 WL 168325, at *2–3.

Defendants' remaining actions (that is, those that were not before the Court in *Kong I*) similarly do not state a claim for abuse of process. To show that a defendant's conduct constitutes abuse of process, "there must be an *unlawful* interference with [the plaintiff's] person or property." *Stevens & Co. LLC v. Espat*, No. 24-CV-5223 (LJL), 2025 WL 950989, at *11 (S.D.N.Y. Mar. 28, 2025) (emphasis added) (quoting *Williams v. Williams*, 23 N.Y.2d 592, 596 (N.Y. 1969)); *see also Bd. of Ed. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n, Inc., Local 1889 AFT AFL-CIO*, 38 N.Y.2d 397, 400 (N.Y. 1975) ("[A]buse of process may be defined as the misuse or perversion of regularly issued legal process . . . ."). Here, however, Defendants acted pursuant to valid judgments of nonpayment and warrants of eviction issued by the Queens Housing Court. Though Plaintiff alleges that Defendants "employed these legal processes not to secure their proper objectives of collecting unpaid rent or lawful eviction, but . . . [to] extract additional payments beyond what was legally owed," SAC ¶ 65, that is simply a conclusory assertion about the legality of those judgments that the Court is not required to credit. The SAC does not contain

11

allegations sufficient to show that Defendants' actions related to seeking payment and eviction were meant to achieve "a purpose not justified by the nature of the process." *Bd. of Ed. of Farmingdale*, 38 N.Y.2d at 400.

### B. Intentional Infliction of Emotional Distress

Plaintiff next alleges that Defendants committed the tort of intentional infliction of emotional distress ("IIED"). Here, too, the SAC describes events included in Plaintiff's earlier complaint, which the Court cannot consider.[2] The remaining actions — Gee's threats that Plaintiff's payments due would increase to $250,000 and Lau's allegedly false police report — do not rise to the level of IIED.

Under New York law, the elements of IIED are: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996). Plaintiff sufficiently pleads this fourth element, as she alleges that she "suffered severe emotional distress manifesting in clinically significant depression and anxiety, suicidal ideation requiring medical intervention, sleep disturbances, physical manifestations of emotional distress, and inability to concentrate resulting in two automobile accidents." SAC ¶ 73.

However, Plaintiff fails to allege facts showing the other three elements. First,

---

[2] Defendants also argue that intentional torts are subject to a one-year statute of limitations. *See* Mot. Memorandum at 19, ECF No. 33-3 (Mar. 31, 2025). That point, even if true, is moot given the *res judicata* concerns precluding the Court's consideration of those older incidents. The Court also notes that Judge Block specifically considered a claim for intentional infliction of emotional distress and rejected it. *See Kong*, 2024 WL 168325, at *2–3.

12

even construing the SAC liberally, it is not apparent to what extent the post-2023 events contributed to Plaintiff's described emotional harm given that much of the factual background provided relates to earlier events that are outside the Court's jurisdiction. In addition, the incident that comes closest to the relevant definition of outrageous conduct described in the SAC involves Plaintiff's physical altercation with the NYPD — but the conduct of the officers cannot be imputed to Defendants. The SAC's allegations thus do not sufficiently establish a "causal connection" between Defendants' conduct and the emotional harm suffered. *Bender*, 78 F.3d at 790.

The Court also does not find that Gee's and Lau's conduct could be described as "extreme and outrageous" under the IIED standard. "The requirements of an IIED claim are 'rigorous, and difficult to satisfy.'" *Levin v. Am. Document Servs., LLC*, 828 Fed. App'x 788, 793 (2d Cir. 2020) (summary order) (quoting *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 122 (N.Y. 1993)). Though "egregious debt collection efforts can give rise to an IIED claim," that is "only if the collection efforts 'fall to . . . a level of loathsome conduct.'" *Grimes v. Fremont Gen. Corp.*, 933 F. Supp. 2d 584, 613 (S.D.N.Y. 2013) (quoting *Assocs. First Cap. v. Crabill*, 857 N.Y.2d 799, 802 (N.Y. App. Div. 2008)).

This standard is not necessarily met even when defendants engage in unlawful and explicitly dishonest behavior. For example, New York courts have found that "[f]alse claims to police resulting in a person's arrest generally do not equate with actions that are so extreme and outrageous in character as to go beyond all possible bounds of decency." *Bostic v. City of Binghamton*, No. 06-CV-540 (TJM) (DEP), 2006

13

WL 2927145, at *6 (N.D.N.Y. Oct. 11, 2006); *see, e.g.*, *Matthaus v. Hadjedj*, 49 N.Y.S.3d 393, 394 (N.Y. App. Div. 2017); *Brown v. Sears Roebuck and Co.*, 746 N.Y.S.2d 141, 148 (N.Y. App. Div. 2002). And though there are certainly some exceptions to this general rule, here, both Gee's demands of payment of $250,000 and Lau's report to the police appear to have been made for the purpose of seeking to enforce valid state court judgments. *Cf. Fudge v. Town of Shandaken Police*, No. 09-CV-300 (TJM), 2010 WL 3258385, at *9 (N.D.N.Y. Aug. 16, 2010) (finding it "particularly true" that defendants' conduct did not constitute IIED where they "acted with probable cause (or arguable probable cause) to arrest and/or prosecute Plaintiff").

Finally, given that both Gee and Lau acted to vindicate their right to enforce valid judgments of the Queens Housing Court, the SAC lacks allegations sufficient to show that their actions were taken with the "intent to cause emotional distress." *See Cagle v. Weill Cornell Med.*, 680 F. Supp. 3d 428, 439 (S.D.N.Y. 2023) (citing Restatement (Second) of Torts § 46, cmt. g ("The actor is never liable, for example, where he has done no more than insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.")). Plaintiff "offers nothing more 'than conclusory allegations that [the defendants] acted with the intent to cause . . . severe emotional distress,'" which is inadequate to state a claim of IIED. *Abadi v. Am. Airlines, Inc.*, No. 23-CV-4033 (LJL), 2024 WL 1346437, at *44 (S.D.N.Y. Mar. 29, 2024) (alteration in original) (quoting *HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 106 (S.D.N.Y. 2020)).

C. <u>False Imprisonment</u>

14

Plaintiff also raises a claim for false imprisonment based on So's report to the NYPD alleging criminal trespass. This claim is similarly unavailing. Generally, there is no officer liability for "false imprisonment . . . if the arresting officer has probable cause to arrest the plaintiff." *Moakely v. P.O. Jane Velarde*, No. 99-CV-8959 (GBD), 2002 WL 287848, at *3 (S.D.N.Y. Feb. 27, 2002). Furthermore, "[w]hen police independently act to arrest a suspect on information provided by a party, that party is not liable for false imprisonment — even if the information provided is later found to be erroneous." *King v. Crossland Sav. Bank*, 111 F.3d 251, 257 (2d Cir. 1997).

Here, not only are Defendants third parties to the alleged imprisonment, the SAC does not allege that the information they provided to the NYPD was actually false, as Plaintiff had already been evicted and was no longer a resident at the property. Indeed, a video attached to Defendants' motion shows that on March 11, after the eviction had been executed, the tenants entered the second-floor unit with the assistance of a hired locksmith. *See* Mot. Ex. E, ECF No. 33-8 (Mar. 31, 2025); Mot. Memorandum at 10–11, ECF No. 33-8 (Mar. 31, 2025). The SAC seems to suggest that the eviction was invalid in part because the marshal "departed without executing the eviction," SAC ¶ 52, but Plaintiff elsewhere states that the marshal "delivered the eviction papers," *id.*, and that the Queens Housing Court later "conditionally vacate[d] the warrant of eviction," *id.* ¶ 58. In any case, Defendants' exhibits showing the various judgments and warrants of eviction issued by the housing court do not permit this Court to credit Plaintiff's bare assertions to the contrary. *See Endemann*, 390 F. Supp. 3d at 370.

15

D. Civil Conspiracy

Lastly, Plaintiff alleges that Defendants engaged in a civil conspiracy based on the above tortious actions. The SAC indeed contains a number of specific allegations outlining Defendants' coordinated efforts to engage in the actions described. *See, e.g.*, SAC ¶¶ 39, 52, 54. "However, under New York law, civil conspiracy is only actionable where there is an underlying tort that is itself actionable." *LaPorte v. Greenwich House*, No. 09-CV-6645 (NRB), 2010 WL 1779342, at *8 (S.D.N.Y. Apr. 26, 2010). Because Plaintiff fails to state a valid claim for any of the aforementioned three causes of actions, she also fails to state a claim for civil conspiracy.

E. Leave to Amend

Although Plaintiff has not requested leave to amend, courts generally "should not dismiss [a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)). However, leave to amend can be denied "when amendment would be futile." *Tocker v. Philip Morris Cos.*, 470 F.3d 481, 491 (2d Cir. 2006). "If the problems with a claim are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to replead would be 'futile' and 'should be denied.'" *Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 510 (S.D.N.Y. 2015) (quoting *Cuoco*, 222 F.3d at 112).

Even when construed liberally, all Plaintiff's claims in the Second Amended Complaint suffer from substantive defects — namely, that all of her enumerated

16

causes of action are predicated on contesting the validity of state court judgments that this Court clearly lacks the jurisdiction to review. The Court is also cognizant of the fact that Plaintiff has already unsuccessfully attempted to litigate claims arising from the same core events before a different judge of this Court. *See Kong*, 2024 WL 168325. Further, Plaintiff has now twice amended her initial complaint in this case, with the second amendment made with leave of the Court after a motion to dismiss had been fully briefed by the parties. *See* Compl., ECF No. 8 (Apr. 24, 2024); Def. Mot. to Dismiss, ECF No. 21 (Aug. 13, 2024); Am. Compl., ECF No. 28 (Feb. 28, 2025). Indeed, in Plaintiff's motion for leave to amend on January 16, 2025, she explicitly stated that she "d[id] not anticipate requiring further amendments thereafter." ECF No. 25 at 1. Given these factors, the Court finds that granting Plaintiff leave to file a third amended complaint against Defendants would be futile and declines to give Plaintiff leave to amend *sua sponte*.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss. The Second Amended Complaint is dismissed with prejudice.

SO ORDERED.

*/s/ Nina R. Morrison*
NINA R. MORRISON
United States District Judge

Dated:   December 5, 2025
         Brooklyn, New York

17